SAVOY, Judge.
Multiple plaintiffs brought suit against the defendant driver and his liability insur- *609 anee carrier for damages sustained in an automobile collision.
The petition alleges that on the afternoon of May 10, 1964, the plaintiff vehicle, going west on a rural road near St. Martinville, Louisiana, was struck head-on on its own side of the road by the defendant vehicle which was going east.
Defendants answered, denying the material allegations of plaintiffs’ petition, asserting negligence on the part of all plaintiffs ; and, alternatively, pleading their contributory negligence. Additionally, defendants asserted a third-party demand against Gerald Romero, driver of the plaintiff vehicle, taking the position that if the defendant driver be found negligent, then Romero was a joint tort-feasor responsible for one-half of any judgment rendered for the other plaintiffs.
By amended answer, defendants averred that General Accident Fire and Life Assurance Corporation paid a certain sum to a Mr. Karl Levickey, guest passenger in the defendant vehicle, and accordingly, credit should be given against any judgment rendered for plaintiffs.
Consolidated for trial with the instant case was the case of Southern Insurance Company, Inc. v. General Accident Fire and Life Assurance Corporation, et al. (La.App., 3 Cir., 1967), 199 So.2d 613, rendered this date, in which the collision insurance carrier of Gerald Romero asserted a subrogation claim against General Accident for the amount it paid toward the damage sustained by the Romero vehicle.
Upon trial on the merits, the lower court granted judgment in favor of defendants and dismissed the actions of all plaintiffs in both suits.
From that judgment, all plaintiffs in both suits have appealed. The two cases are consolidated on this appeal.
The accident happened in the following manner. The plaintiff vehicle was proceeding in a westerly direction, and the defendant vehicle was proceeding in an easterly direction. The road on which they travelled was of dirt surface and was under repair. All witnesses agree that an extremely dusty condition existed. The defendant vehicle was following a dump truck, which was raising considerable dust. As the plaintiff vehicle and the truck passed each other, the plaintiff vehicle entered the cloud of dust. The two automobiles collided with each other in the plaintiffs’ (north or westbound) lane of travel.
On the plaintiffs’ side of the ledger it is contended that the plaintiff vehicle was on its proper side of the road and was proceeding at a reasonable rate of speed. Defendants contend that the defendant vehicle was forced to drive in the westbound lane because of the presence of dirt that had been piled along the south side of the road, thus reducing it to one lane of travel, and that the plaintiff driver should not have entered the dust cloud raised by the dump truck without taking greater precautions than he did.
The two state police officers who investigated the accident stated the road was approximtely 33 feet in width at the point of the collision; in other words, that there was ample room for two cars to pass each other. However, it does appear quite definite that there was dirt piled on the south side of the road. The officers did not measure the distance from the point of impact to the dirt piles, but estimated it to be 50 feet, more or less. Both the defendant driver and his passenger testified that prior to the time of impact dirt was piled on the south side of the road, thus forcing them to drive in the westbound lane. While there is no conclusive evidence on the point, it appears that the piles of dirt ended a relatively short distance before the point at which the two vehicles collided.
The defendant driver and his passenger testified that as they were following the *610 dump truck they could see its back end in front of them, but could not see ahead of the truck, nor were they able to determine when the piles of dirt ended. Their speed was approximately 35 to 40 miles per hour.
In view of the fact that there seems to be no question of the extremely dusty condition of the road, we see no error in the lower court’s finding that Camille F. Peele, the defendant driver, was negligent. No citation of authority is necessary in holding that, under the circumstances, Mr. Peele should have stayed far enough behind the dump truck to see approaching traffic ahead of him, especially since he and his passenger both admitted they knew they were travelling on what was their wrong side of the road. While Mr. Peele testified that a sudden slackening or change in the wind caused the dense cloud of dust which blinded him, it nevertheless appears quite clear from the record that a generally dusty condition did exist, which should, in our view, have prompted him to maintain a sufficient distance between himself and the dump truck to allow for defensive action against opposing traffic. It goes without saying that had he maintained a greater distance between his automobile and the truck, he would have had a better view of the road ahead.
We will now consider the question of plaintiff driver’s conduct. He testified he slowed to a speed of about 35 miles per hour as and after he entered the cloud of dust raised by the truck. That testimony is substantiated by other witnesses in the plaintiff vehicle. He admitted he could see nothing beyond the dump truck because of the dust.
Plaintiffs and defendants have cited various cases tending to show, on the one hand, that a driver is negligent in entering a cloud of dust when vision is obscured, and, on the other hand, that one is not necessarily negligent in so doing. Each case, however, must rest upon its own facts. See Broussard v. State Farm Mutual Automobile Insurance Company (La.App., 3 Cir., 1966), 188 So.2d 111, at page 116, in which this Court stated:
“When a motorist’s visibility ahead is impaired, it is true, he should reduce his rate of speed to such extent and keep his automobile under such control as to reduce to a minimum the possibility of accident from collision with objects ahead. * * 1 * Nevertheless, the degree to which the motorist must reduce his speed depends upon the particular circumstances, including the factual degree to which his visibility is obscured.” (Citations omitted.)
Factually, the plaintiff driver in the instant case admitted, as set forth above, that he could not see into the dust cloud or beyond the dump truck as he approached it and entered the cloud.
While the law does not expect absolute perfection from a driver who approaches a condition of reduced visibility, it does expect that he act prudently under the existing circumstances. Thomas v. Stewart (La.App., 1 Cir., 1947), 29 So.2d 604; Audubon Insurance Company v. Cunningham (La.App., 1 Cir., 1961), 132 So.2d 657. See especially Felder v. Eagle Star Insurance Company (La.App., 1 Cir., 1955), 79 So.2d 90, a case somewhat similar on its facts to the instant case, in which the plaintiff was allowed to recover only on the basis of the fact that she had applied her brakes for a full stop and was either completely or nearly stopped at the time of the collision.
In the instant case, plaintiff driver made no real effort to stop his vehicle or even slow it appreciably, although he could see little or nothing ahead of him. He merely reduced his speed from about 45 to about 35 miles per hour. We think it pertinent to note that Mr. Antoine Laviol-ette, a disinterested witness who came upon the scene of the accident after it occurred, testified that he passed the dump truck a short distance east of the scene of the acci *611 dent; that the truck raised a “terrific amount of dust”; and that, accordingly, he pulled off to the side of the road until it passed and the dust had cleared.
Under the circumstances, we are of the view that the plaintiff driver was con-tributorily negligent. Accordingly, his individual claim must fall, and that of Southern Insurance Company, Inc., his collision insurance carrier and plaintiff in the consolidated case. With regard to the latter, a separate decree will be entered.
We now take up the question of the passengers in the plaintiff vehicle. Seated on the front seat next to the driver, Gerald Romero, were his wife, Mrs. Gerald Romero, Mrs. Elier Touchet, his mother-in-law, and Angie Romero, the infant child of the Romeros, who was sitting in Mrs. Tou-chet’s lap. In the back seat were Geraldine Touchet, age seventeen, Sally Touchet, age ten, and Sandy Touchet, age five, daughters of Mr. and Mrs. Elier Touchet, along with a male passenger who is not a party herein.
From a careful reading of the record, we do not feel these passengers are guilty of any contributory negligence. All but two of them are minors, and could hardly be expected to have had any control over the operation of the vehicle under the circumstances. Both Mrs. Romero and Mrs. Touchet apparently asked the plaintiff driver to slow down prior to the collision.
We thus arrive at the question of the quantum of damages as regards the passengers.
Mrs. Gerald Romero, while about three months pregnant at the time of the accident, delivered a normal child without difficulty related to the accident. She was seen by Dr. J. L. Comeaux, a general practitioner, and by Dr. James Gilly, an orthopedic surgeon. Both of the doctors found bruises and some muscle spasm in the area of the neck and shoulders, with moderate pain and tenderness. Dr. Comeaux estimated her period of discomfort at about one month; Dr. Gilly figured about six weeks. She saw Dr. Gilly only once, and was discharged by Dr. Comeaux on June 17, 1964, five weeks after the accident. She complained of nervousness over her pregnancy and the effect the accident might have upon it. It does not appear, however, that Mrs. Romero’s injuries were particularly serious. We feel that an award to her of $1,000.00 would be adequate.
Mrs. Elier Touchet was also treated and examined by Drs. Comeaux and Gilly. She saw Dr. Comeaux in the hospital emergency room following the accident and then again on four other occasions during May of 1964. Objectively, the doctor noted multiple bruises over the upper body and a small laceration of the forehead. Her main complaints, however, were of aches and pains over most of her body, including the back, neck and left knee. At the end of May, he found her improved. She did not return to him until October of 1964 apparently for some reason unconnected with the accident, although the doctor did quote her as saying that her neck “still kind of bothered her a little bit, not very much.” Dr. Comeaux has treated Mrs. Touchet on several occasions since then, spanning a period of several months but for reasons not related to the accident.
Dr. Gilly first saw Mrs. Touchet on May 26, 1964, at which time her chief complaints were of pain in the neck and left knee. He stated that examination of the knee was very difficult because she is a rather heavy persons, weighing 250 pounds or more. With regard to the neck, he felt she had sustained a cervical sprain, and felt that the best treatment for her would be modified rest, that is, no more use of the affected parts than was necessary until improvement. Dr. Gilly did not see her again until May 26, 1965, just prior to trial, at which time she was complaining of pain in the neck, radiating to the shoulders and between the shoulder bládes down the middle of the back. He found that the cervical *612 spine revealed some contracture of the left trapezius muscle and tenderness over the fifth and sixth cervical vertebrae. Flexion was limited about twenty per cent, and left rotation and left flexion about fifteen per cent. He attributed the difficulty to the accident and felt it was likely to be permanent, with a residual loss of function of the neck amounting to about fifteen per cent. Expressed in lay terms, he said there was no limitation in the shoulders; that there is probably permanent shortening of the left trapezius muscle which limits forward bending of the neck about twenty per cent or one-fifth of normal; that turning and bending of the neck to the left is limited about one-eighth of normal, with no limitation to the right; that persons so affected reach their limitation and then cannot go any more; that Mrs. Touchet would probably experience pain if she forced herself past her limitations.
Whiie it seems a little unusual that Mrs. Touchet did not complain to Dr. Comeaux on the several occasions she saw him between October, 1964, and May, 1965, Dr. Gilly is a specialist in the field of orthopedics, and his testimony is uncontradicted. It is obvious from the record, however, that Mrs. Touchet has been treated on numerous occasions before and after the accident for a variety of ailments, including complaints of pain in the back and upper body. She is described by the doctors as being a very obese person, difficult to treat for that reason, and apparently somewhat subject to various difficulties. Assuming that the difficulty found by Dr. Gilly will be permanent, it nevertheless does not appear to us that it is of great magnitude, all the circumstances considered. In our view, an award to Mrs. Touchet of $3,000.00 appears adequate.
Sally Touchet was seen by Drs. Comeaux and Gilly. In essence, the doctors found she had a sore shoulder for about two weeks and a bruise on the right leg. Neither was severe, and actually, her injuries were of no real consequence. An award of $250.00 seems in order.
Sandy Touchet was seen by Dr. Comeaux. He examined her right after the accident, found nothing wrong, and, in effect, discharged her right then. No award is necessary here.
Geraldine Touchet was seen by Dr. Comeaux in the hospital emergency room following the accident. His only finding was a hematoma, or blood blister, about the size of a fifty cent piece on her right lower leg, to be treated with hot compresses. He stated she had no other complaints and that he found nothing else. In effect, he discharged her at that time, to come back only if some difficulty developed. Due to the very minor nature of the injury, we will award $75.00.
The infant, Angie Romero, was seen by Dr. Comeaux. He examined her at the hospital following the accident. In short, he found nothing whatsoever wrong and discharged her. No award is justified, nor is the mother’s testimony to the effect that the child was cross and irritable for a time after the accident sufficiently probative to support an award.
As regards special damages, Gerald Romero sued inter alia for his family’s medical expenses, which claim is denied in view of our finding him contributorily negligent.
Elier Touchet sued for his wife’s loss of earnings as a babysitter, claiming $60.00 a month for two months. We think the medical evidence and Mrs. Touchet’s testimony substantiates the loss for one month, and will award $60.00 therefor. In addition, certain of the family medical expenses incurred for actual treatment have been adequately proven or stipulated, which amount to $332.82. The total is thus $392.82.
Finally, the defendants’ third party demand against Gerald Romero should pre *613 vail in view of the finding of contributory negligence, and judgment should, therefore, be granted against him for one-half of the amounts otherwise awarded. LSA-C.C. Article 2103.
For the reasons assigned, the judgment of the lower court is affirmed in part and reversed in part; and it is, therefore:
Ordered, adjudged and decreed that there be judgment herein against the defendants in solido in favor of Mrs. Gerald Romero for the sum of $1,000.00; in favor of Mrs. Elier Touchet for the sum of $3,000.00; in favor of Elier Touchet, individually, for the sum of $392.82; in favor of Elier Tou-chet, for and on behalf of the minors Sally Touchet and Geraldine Touchet, for the combined sum of $325.00; all together with costs in the lower court and on this appeal.
It is further ordered, adjudged and decreed that there be judgment herein on the third party demand in favor of the defendants, General Accident Fire and Life Assurance Corporation and Camille F. Peele, against Gerald Romero, for one-half of the total of the sums above set forth, but, within our discretion, exclusive of costs.
Reversed in part and affirmed in part.